Mr. Herzog May it please the Court, my name is Lawrence Herzog, and I represent Ms. Hampton. I did not represent her below. This is an unusual case, Your Honors. The two claims are that the officers or the agents who conducted the search of the apartment at issue had not even read the search warrant or been apprised of its It's not that unusual because we've said that when they apply for a warrant and then hear that it's been approved, that's okay. Your, it depends on the idea that actually the warrant doesn't quite match what was requested in the application, right? I would think that that's fairly significant. But isn't it significant whether the officers in fact exceeded the scope of the warrant that was given? Well, they did. They seized cell phones and guns, which were not in the warrant. Well, the warrant authorized the seizure of electronic devices, including cell phones. It just didn't authorize the search of them. And in fact, they seized them. But then when they brought them back, somebody pointed out that they weren't authorized to search them without another warrant. And they in fact got another warrant, right? That's true. So if we previously said that even if you didn't specifically read it, if you understand that the application was approved, you could conduct the search, why doesn't that apply here? Like if we understand the interaction of the different people in law enforcement, as long as what they do adds up to acting within the scope of the warrant, we think it's okay. Why doesn't that just apply here? Well, Judge Minasci, there's a curious explanation, if that's the right word for that. At the end of the magistrate judge's report, she says, although I include that the seizure of the phones was authorized, I'm, and I'm now going to paraphrase, I'm telling the agents never to do it again. And this was wrong. And this was a bad mistake. Never to do what? To not read the affidavit or not read the actually issued warrant. And it strikes me as very odd that the magistrate judge, you know, took that position but at the same time let the, I mean, the point of the exclusion. Why is that odd? I mean, that happens all the time. We say, well, that's not really a great practice, but we can't say that it's unlawful or that it requires suppression of the evidence, right? Like, that's not a coherent position. Well, you know, the point of, as I, of course you know, the point of the exclusionary rule is to deter police misconduct. And that sounds very much to me like the judge was saying this is misconduct and I am instructing you not to do it anymore. But — Well, judges give free advice to lots of people, lots of lawyers and lots of law enforcement and everybody else. That's not quite the same thing as making a legal ruling that this was unlawful. That's correct. And — Suppose the original application had not included cell phones at all in any way, shape or form. The draft didn't even say that. But then they see cell phones in plain view and they think, well, that could well have evidence of crimes. I'm going to seize them. I know I can't look into them without a warrant, but I'm going to seize it in plain view and then go and ask for a warrant to allow me to search it. Would that be a violation of something? The officer who was in charge of the search said, I don't care if the warrant said it or not. That's right. So I'm asking you, is he wrong? In other words, if the — there's this interesting little wrinkle that he may have thought at the time that he was authorized to seize the warrant, seize the cell phones, because that's what he'd asked for and no one told him that he hadn't gotten it. But I'm just saying, suppose it was not in the warrant application at all. Would there be a justification for seizing a cell phone and then going and asking a judge for permission to search it? Well, the government argued that that was the justification for seizing the guns, that the guns were not in the warrant, but they are somehow always attached. If you find a gun and drugs in the same place, the gun must be relevant to the drug charges, which I also dispute. And I think that it was — I mean, I don't know exactly where they looked, but to call something in plain view, if you are familiar enough with the way police and agents conduct searches, that they look all over. And I don't know that plain view — Well, certainly when they're looking for cocaine. I mean, if the search is for a corpse, you can't look in a dust drawer, right? You know, the question is — But it's not in plain view, Judge Lange. Right. But if something is in plain view, if you're searching for a corpse and when you walk in, you find a table with a lot of what appears to be cocaine and all the impediment of illegal drug sales, you could seize that stuff, right? Well, that's because it's on the table. Right. The cell phones were also in plain view. What about the guns? I mean, the point is that the record doesn't show — Well, the cell phones were in plain view, but I guess you would say they need to have a reason to think that there's evidence of a crime on it, right? And — But if they have that and they're worried it might be destroyed, that might be a justification for seizing. So get another warrant. Call the magistrate. And maybe you can secure the scene or maybe there's a reason to — But I guess that would be the kind of analysis that would — That would go into that. But that's a hypothetical question. I don't think we should — What we've actually got is something a little different. Well, I guess where I was going is with the question about what if it was never in there, is the fact that it was stricken is not the same thing as saying you're forbidden to seize it. It's just it was not something that you were authorized to seize by the warrant. If you had some other justification for seizing something that you found in the course of the search, that would be permissible to seize. Well, I suspect, although I don't know, that the reason guns were not mentioned is because this confidential informant never saw a gun. He paid money.  He got drugs. Right. Who knew if there were guns in the house? Right. But if they thought that guns are an integral part of drug dealing, I would think they would have put in drugs — I mean, guns and, you know, cutting — cutting agents and all the other things that we all unfortunately know are part of the drug trade. Let me shift quickly to the —  But just one further question. To the extent that even if we were to conclude that they should not have seized the phones, was anything from the phones ever used as evidence? No. No. Okay. Let me go to — quickly to the sufficiency point. We have another unusual case here, and we didn't file this as a reason to overturn because we know that inconsistent verdicts don't carry the day. But they're claiming that because they found drugs and guns in the apartment and the apartment leased to Ms. Hampton and Ms. Hampton and her two children were sleeping in their home, that because these things were found, that means Ms. Hampton is part of the drug situation. But they acquitted her of the drugs and the guns. And it's very unusual. I understand it's not dispositive. But, you know, I'm taking it back at the notion. And I really want — But if the jury could — if the jury were to conclude that maybe there's not enough evidence that she did the particular transaction — They didn't hear about the — They concluded that an important purpose of the premises was drug sales, and she maintained the premises. Judge, the jury never heard about the transactions. The actions with the confidential informant were kept out of the trial because there was an issue about whether the confidential informant was going to have to testify. The defense actually called — you know, wished to call the confidential informant. The government opposed, and the judge said, no, so long as you don't talk about what the confidential informant — They could have convicted her because they were instructed under aiding and abetting, maintaining premises for the purposes of manufacturing and distributing or using cocaine. Not with the actual possession, but for aiding and abetting, which they were instructed. And that wouldn't necessarily be inconsistent, particularly as I understand it, the loaded gun was found on the desk she was working near her phone. Am I wrong on the facts on that? I don't believe she was — I thought she asked for smoke, and she said, go, it's where my phone is, on my desk. Her cigarettes were on the desk. And the loaded gun — Her cigarettes were on the desk. And — And the loaded gun was on the same desk. Your Honor — Counsel, just a simple question. Sure. Was the loaded gun on the desk she identified as her desk, yes or no? The simple question is, she identified it as — No, my question. What is the answer, yes or no? She identified it as her desk. She never said that she works at that desk. She said the cigarettes are on that desk. Okay. Her cigarettes are on the desk.  Right. And the phone and the loaded gun. Right. And the phone was hers. And what does that have to do with maintaining — Was the phone — well, the jury is allowed to draw inferences, are they not? Yes, but reasonable ones. And so it's not reasonable to believe that a loaded gun next to a phone that belongs to her with her cigarettes on the same desk would be unreasonable for a jury to attribute all that to her? And then acquit her on the possession of the guns and possession of the drugs? They may have believed she aided and abetted. You can't — aiding and abetting maintaining a drug residence. I understand what aiding and abetting drug sales is and guns is. But aiding and abetting maintaining a drug residence has to do with an agreement with the principal. Okay, I'm going to rent the house for you, and you're going to use it for your drugs. This was her home. Her children lived there. Little kids, 14 and 7, I think they were. And, you know, if she — Couldn't that just explain the theory by which she could be doing it? So if it was her home and an important purpose of it was drug sales, wasn't she at least aiding and abetting? Because you say it's her home where she had her children, and she — so she maintained it. Wasn't she at least aiding and abetting the maintenance of the premises for the purpose  It's my understanding — it's my understanding that an innocent bystander isn't aiding and abetting. And I think she would be in that case if her — if her partner, whoever that guy was, that — that sold the drugs to the CIA, although the jury didn't know about that. You know, I mean, if my — So you're saying the theory would be she didn't know that he was doing that. You know, my wife and I — But then the evidence about finding all the stuff on her table and whatever, wouldn't that allow the jury to conclude she didn't know? My wife and I own our house together. If my wife decided to become a drug dealer, is the fact that I'm living there aiding and abetting? The mere fact that you live there might not, but if — So what's the evidence — — you found with drug paraphernalia laying about and you live there, maybe — Well, if my wife's a drug dealer, she's going to have drug paraphernalia. I mean, my wife's a college professor. She has all her college professor stuff lying about. If she were a drug dealer, presumably she would — But even if she had never told you, you would know that she's a professor, right? Just because you live together and you see the stuff. I mean, if being a professor was illegal, it's what I was — It's what I understand, right? How about being a possessor and distributor of drugs as opposed to being a professor? Same logic. You know that the person that lives in a house for which you are an owner or you are on the And you allow them to continue to engage in that occupation in the house that belongs in part to you. Are you not maintaining the premises? I don't see how. If it's your house and you live there with your children and your partner starts to do something illegal, is it your obligation to move out? Now, if you say to him, hey, great, share the money with me, that's how we'll make our living, that is, of course, aiding and abetting. But if she just says, you know, what are you doing? You know, and like he's her partner and he does it. Is that aiding and abetting? I understand. Why is it ridiculous to think that if you're maintaining a president's present premises and you know that it's being used to do illegal drug trafficking, you're not required to say you've got to stop it, otherwise I'm not going to let you live here with me? Why is that an unreasonable burden? Judge, to give an example, if you know that someone else that you know is dealing drugs and you're good friends with them and you spend a lot of time with them, you have no obligation to tell anybody. Right, because it's not in the criminal code that you're not allowed to be friends with a drug dealer. It is a crime under the criminal code to maintain a premises to be used for the purposes of drug dealing. That's a different thing. Now you are. I mean, you know, one of the funny things about this statute, and I grant you this seems to me to be, you know, as a legal matter it's somewhat inconsistent to say you didn't aid and abet the other person's drug sales and then to simultaneously say that you maintained the premises because the statute about maintaining premises has always struck me as just a specific instance of aiding and abetting. If you let your house be used by somebody to store drugs, they might be your drugs, but you are aiding and abetting their possession of drugs and their storage of drugs and their drug business. But this is a very specific statute, and I can well see why a jury, even a well-instructed jury, might not think if their attention is specifically called to a statute about maintaining the premises, might say, oh, yeah, that's exactly what she did, while being a little bit leery of then convicting her of what would certainly seem to the jury the more serious offense of being guilty of the substantive drug dealing by means of aiding and abetting. The statute says, Judge Lynch, lease, rent, use, or maintain for the purpose of selling drugs. She, I argue, maintained it for the purpose of giving her two children a place to live. But that would be the same. But, excuse me, that's the same as if the – if there was unquestionable evidence that she was the person who owned the drugs, you could make the exact same argument, and we projected that argument. In other words, for some reason, it was my house. My main purpose in having that house was to have a place to live. It so happens that in addition to having a place to live, I also pursue this illegal activity. But that's not why I maintained the premises. And that's why – I'm sorry. You're guilty. That's why I think relying on aiding and abetting in this particular – with regard to this particular statute is almost impossible. Yeah, it's kind of aiding and abetting, aiding and abetting, in a way. Basically. Anyway, if there aren't any more questions, I have no more time to say. Thank you very much, Mr. Griswold. Give us your time for rebuttal, so we'll hear from you then. But let's turn to the government. Mr. Eldridge. Good afternoon, Your Honors, and may it please the Court. Sean Eldridge for the United States. This Court should affirm the judgment while granting a limited remand to address the Mariana issue. I want to jump in with some of the questions that the panel asked my friend. Judge Manaschi, I think your point to say – the point of your question to say it may not be a great practice, but it's not unlawful is exactly right, because this is an objective test, and we're looking at what was seized. And the reality is, as the district court found, there was nothing that was seized from the residence that was improper. Judge Lynch, your question, the hypothetical about the phones not being in the warrant hypo, and what do you do? I think one of the points you were getting at later is that stricken doesn't mean illegal. It just means that it's not authorized under the warrant. So you'd have to have some other basis. Other than litigation. Absolutely. And that could be a litigation risk if the officers were to do that, to say it's stricken from the warrant, but I believe it falls under whatever, plain view, and then the defense could move to suppress that. But again, this is why we're also still not in the general search category, which is the only way that my friend wins, is because even in that circumstance, in which to be clear, the warrant still says cell phones in another spot. The district court found that cell phones were appropriate. There was a question, too, about what happened with the phones. They weren't searched. They weren't searched at all. I mean, that's clear from the record below. They were returned. They were not searched. Nothing was used. But let's take all of those in the opposite and say that the phone was searched or seized illegally. Then you could file a Rule 41G motion to get it returned or moved to suppress. We would litigate that individually, and the remedy would be suppression of that one piece. And that's where we go with that. There was — But we have this flagrant disregard idea that sometimes we think the officers are behaving irresponsibly, right? So if you don't bother to read the warrant, why isn't that flagrant disregard? So two answers to that, Judge. I mean, first, the case law says that that's not the test, and I think that ends the analysis. This Court has said that twice, that what flagrant disregard starts with is that there has to be a widespread seizure affected of items that were not within the scope of the warrant. And we just don't have that here. But it's also not — look, I don't — to get on to my friend's point about what Magistrate Judge Payson said at the report and recommendation, I think is what we would all say. Of course it's a great practice to read the warrant before you execute it. Of course that's what you should do. And I think the officers here said, yeah, maybe it was a significant oversight is the term one of them used, which is accurate. But here's the reality. Putting aside the most important part, which is nothing was improperly seized, and that ends the case. They read the draft that they prepared and gave to the judge, right? There were three officers who testified at the suppression hearing. Officer Goodfriend, who was really just a SWAT member, went in, secured the house, and said, I wasn't part of the search. The other two, Sergeant Anderson, Special Agent O'Hara, both said that they had reviewed the warrant ahead of time. They knew what was going to the judge. They knew that they were doing a narcotics search. Yes, they should have read the final document, or someone should have told them, oh, by the way, paragraph X was stricken. But considerably when — which is unusual for a judge to strike part of the warrant. Right? I've had it happen to me many times, Judge. But in my practice, it was not the usual thing as a former prosecutor. But the fact that the judge did that should have alerted the officers, like, hey, the judge pushed back on something. A hundred percent. So there's more of an impetus to share that with the officers. You will get no argument from me that that information should be conveyed and that the officers should be reviewing the warrant. No argument at all. And I understand that's a bad fact for us. And I understand that's why my friend wants to have so much fun with it. But the test here, we don't even come close to getting there. I don't know if anything turns on this. I'm sorry. I'm sorry. I don't know if anything turns on this. But it might also be the case that just as a matter of practice, you never really search the cell phones at the scene. You would just seize them to search later. And so actually the officers on the scene, it didn't really matter. Like, one way or the other, they would have done the same thing. Is that possible? No, I think that's right. And I think you're absolutely right, too, then to say that you would go back and get a separate warrant for it. That's usually the way it's done. Not always. But very much when it's time to search the phones, somebody would evaluate whether it's authorized because it's a second step apart from the scene. Agree. And even if we jump down that and the seizure of that phone was under this hypothetical inappropriate, we're still just talking about suppression at 1 a.m. My friend said that the – I think we were turning to the sufficiency part when he said that the actions of the buys were not before the jury at trial. And respectfully, that's just wrong. They absolutely were. In fact, it was Ms. Hampton's attorney who brought out the facts of those buys through the officers who participated and established and argued to the jury that the first two buys – remember, the series of four buys takes place over about two months – that the first two buys were made from a black male, the second two buys were made from a black female. The officers didn't do identification procedures to see who exactly – who they were, and that was a point of their argument to say, you don't physically know who the person was, and there was this other gentleman. But it was someone in her pajamas, so we could infer that it was somebody who stayed in the house, right? I would say the inference is that it was Ms. Hampton because that particular buy made from the black woman in her pajamas was the day before the execution of the search warrant, which took place at 6 a.m. the following morning. Did the judge strike the part of the phones? I didn't see it as you're allowed to seize them and then to search later. I thought the judge struck the part of the warrant that allowed seizing of the phones as part of the conspiracy to engage in drug transaction, but allowed it in a section that allowed seizing tracking devices so that it was – they were being seized for different purposes. And I wonder if it's because in a typical warrant it would say, you know, CI was searched, CI placed a call to the target, arranged for purchase of whatever amount of drugs for a specified amount of money, was given money marked by the government, searched, the deal takes place, comes back. So usually there's a reference. I didn't see a reference to phones being used to schedule the buys, which might explain why the judge cut out the phones. Sure, Judge. But I didn't see it as you're allowed to take the phones and then you can search later because this is just a seizure. Obviously, phone searching is much more involved. It's technical. So I'll say a couple things about that. One, you're right, we don't know why Judge Randall and the county court judge struck it. But it is what it is. Two, you're right that it was struck in one provision and then the later provision, which talks about electronic devices being used for the purposes of video or audio surveillance, et cetera, et cetera, including cellular telephone devices, is in. But it's a very particular purpose. It is. But I will say, Judge, I do think – I mean, I don't think it changes your argument. It does. But what I'm saying is I could probably see why the judge signing the warrant may have been skeptical. Right. Because there was no reference to phone use. And I may have misheard part of what Your Honor said, but the part that was stricken out did authorize the searching of the contents of cellular phones. Right. So, again, we're back to search versus seize, but in any event, there's no argument that phones are still in in this case. On the sufficiency, I mean, I don't want to go through all the evidence, but, I mean, Your Honor's made several of the most salient facts addressed in your questions, which were that Ms. Hampton the day after this last buy is found in her house at her table. That's what she called it. She called it her table. And when Officer Godfriend enters the door at 6 a.m., she says – She was sitting at the table? Was there evidence that the jury heard that she was – because the description is that she was at the table and then ran upstairs. That's right, Judge. I don't think that the testimony, as I recall it, was not that she was sitting at it. It's just that she was at the table. Because the table is pretty much right in front of the staircase. So Officer Godfriend says he goes in. He sees Ms. Hampton behind the table. I think the inference is she was standing, but either way, in very close proximity, right at that table. And that table is where all this evidence is found. Drug packaging material, 50 bags of cocaine, the gun, et cetera. And the argument is not, as my friend said, that guns are always seizable. And here, I mean, you have guns that is literally right next to drugs. Or upstairs in Ms. Hampton's bedroom where you have a shoebox full of drug materials and you have a gun holster in that very same room, which shows the connection which this Court has said more times than I can count, that the connection between firearms and drug trafficking. And she acknowledged, as I understood, that she was aware of the gun, right? Did she say something like she found it in the yard and it was her intention to return it? That's right, Judge. To law enforcement, but because of COVID she had not had a chance? That's essentially right. So she acknowledged to the jury she was aware of the gun. I mean, by that testimony. Investigator Thompson from the Monroe County Sheriff's Office was part of that interview, and that is what she said in the interview, that she found the gun and she was going to give it back to law enforcement, but didn't because she was afraid of certain things, including COVID. That's right. Unless the panel has any further questions, I'd ask you to affirm, other than granting the limited remand on the Mariana issue. Thanks very much. Thank you very much, Mr. Eldred. We'll turn it back to Mr. Gerzog on rebuttal. Your Honor, with all due respect, Ms. Hampton did not testify, so the jury never heard anything from her. I'm not sure how, if what Your Honor is talking about got in front of the jury, I'm not sure how that happened. But she did not actually testify. And it's, again, the only way the government can say that it's even conceivable that she is guilty of harboring or retaining is as an aider and abetter. And I think the evidence does not show or describe aiding and abetting. And I frankly wonder how many cases there have been where someone is convicted of aiding and abetting maintaining a place. I mean, suppose you're the guy, the woman who comes in and sweeps up. Is she aiding and abetting? Suppose she sees the drugs. You know, I mean, it's a very iffy concept. The indictment charged, I haven't looked at it lately, but I'm recalling there was nothing unusual about it. And what would be unusual is that someone is charged with maintaining the premises and then it says under whatever the number of that statute is, end section 2, meaning that it incorporates aiding and abetting as one possible theory. That's because you are a former SCNY assistant and I am a former ED, but that is not what the indictment says in there. The question is. Kennedy, I didn't say she was aiding and abetting the maintaining of the premises. None of the three charges have that section 2 language. I specifically looked for that. But it doesn't have to have it. Well, no, you're right. You're right. But I guess I'm just asking a slightly different question, which is what is the argument that she was convicted of aiding and abetting? Is that just based on that that was the charge, so it could have been that that was the jury's theory? That appears to be what I heard from the bench, that Mr. Gosar, don't talk to me about, you know, whether she actually was a partner in the business. No, no, no. It's not about her being a partner in the business. It's if you are maintaining the premises, knowing what the purpose is that it is used for, that's a somewhat different thing. She's not charged. If she was charged with aiding and abetting the drug sales or something like that.  Well, presumably, actually, the jury instructions charged aiding and abetting on the guns and the drugs as well.  Right. But she was acquitted of those subsequent charges. Yes, she was. Right. So the jury did not find specifically that she aided and abetted, but it did find that she did maintain the premises. Of course she maintained the premises. Well, that's a $64,000 question. How did they prove that? By the fact that drugs were there. And all they said. I mean, so we have said that maintaining the premises for the purpose of the drug sales, for the purpose doesn't require that it be the person's primary purpose. It just has to be a significant or important purpose of the premises. Right. So putting that together, she was maintaining the premises, and a significant or important purpose of the premises was drug sales, or at least the jury could conclude that it was. Because there was drugs. You're sort of saying, well, that doesn't make a whole lot of sense textually because if she's the one maintaining the purpose, it's not really her purpose. Well, we don't know. It's somebody else. But, you know, that just seems to be equivalent with the way we've interpreted the statute, and that's what we've said in the precedence. Right. What I was trying to suggest, Your Honor, is that there's not enough connection. I mean, frankly, in my entire career, I've always been a little frustrated about aid and abet. But, I mean, it's a little unclear as to exactly what actions aid and abet and what other actions do not. And, you know, when I was a prosecutor, I loved it because it was sort of a catch-all. Yeah, but I'm just saying, if the way we understand this — I mean, I guess two things. One is, if the way we understand the statute is you are maintaining a premises, a significant or important purpose of which is drug sales, the jury could conclude that she did that, right? I don't know, Judge. She's maintaining a home. It's a different — She's maintaining a home where it's possible her partner is conducting a drug business. And she's not maintaining it for him, but he's her partner, and he's using it for that purpose. Does she have to tell him to move out, or she's aiding and abetting? And as my colleague said — My hunch is aiding and abetting. She might be maintaining a premises that has that purpose. So that's the problem. One other thing before I sit down. My colleague mentioned the fact that there was some — I don't remember now whether it was a C.I. who told the agents or the agents who told the jury about the black woman in the pajamas. But it struck me, frankly, as a little bit beyond the pale to suggest that if you found that if a black woman in pajamas, they can describe her. My friend says the agents were able to see her. But if the very next morning she's the only — she's the only adult living in the premises, why couldn't the jury at least infer that that was her? She's the only black woman is the problem. And, you know, black people don't all look alike. I mean, that's — you know. But were there others found in the apartment or in the premises? Not that I'm aware of. So it's not about the description. It's like she's the only adult. Like, even if the description was there was an adult in pajamas — You think that would have sufficed? I would not think that sufficed, an adult woman. Well, I take it if the evidence were there was a white woman in pajamas who handed the drugs, and then Ms. Hampton is clearly not a white woman, that would cut one way. But if it was just there was a woman in pajamas, which suggests that it's someone who was comfortable in that apartment, not just a random visitor. It was her home. Of course she was comfortable. Well, yes. I'm talking about the woman who gave the drugs. If that is the person who gave the drugs, and now there is the only one adult woman around in proximity to the drugs and the guns and everything else, it seems like a pretty reasonable inference that that's the same woman who was there the morning before at the same time. And I'm looking at the closing argument, GA-410-411. She made precisely the argument you're making to us here. It wasn't me. I just lived in the house. I had nothing to do with this. I'm just a black woman in a house, and bingo, they charge me without any investigation. She made all those arguments to the jury. They didn't accept them. So what are we to do with that? Well, what I'm asking you to do, and you may not do it, is say that, therefore, the evidence was not sufficient. Even though she, her lawyer, asked the jury to take that into account, that the fact that they apparently didn't, it doesn't mean it's sufficient. Thank you. Thank you very much, Mr. Herzog. The case is submitted.